# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JASMINE SADE D.,[1]                     )
                                        )
                    Plaintiff,          )
                                        )
vs.                                     )        Civil No. 3:23-cv-03141-GCS
                                        )
COMMISSIONER of SOCIAL                  )
SECURITY,                               )
                                        )
                    Defendant.          )

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 423.[2]

### PROCEDURAL HISTORY

Plaintiff applied for DIB on July 14, 2021, alleging a disability onset date of August 28, 2018, later amended to November 28, 2020. (Tr. 33, 54-55). After holding an evidentiary hearing on December 13, 2022, the Administrative Law Judge ("ALJ") denied

---

[1]     Plaintiff's full name will not be used in this Memorandum & Order due to privacy concerns. *See* FED. R. CIV. PROC. 5.2(c) and the Advisory Committee Notes thereto.

[2]     This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). *See* (Doc. 9).

the application on February 22, 2023. (Tr. 30-47). The Appeals Council denied Plaintiff's

request for review on August 3, 2023, making the ALJ's decision the final agency decision

subject to judicial review. (Tr. 1-6). Plaintiff exhausted administrative remedies and filed

a timely complaint with this Court. (Doc. 1).

### ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issue:

1.   The residual functional capacity ("RFC") was improperly based on the
     ALJ's own lay interpretation of raw medical data rather than upon
     substantial evidence.

### APPLICABLE LEGAL STANDARDS

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the

applicable statutes.[3] Under the Social Security Act, a person is disabled if he or she has

an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five

questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have

---

[3]   The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20
C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and
1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical.
Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies
on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations
out of convenience.

a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *See Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken

into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## THE DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. He found that Plaintiff met the insured status requirements through September 30, 2021. He also determined that Plaintiff had not engaged in substantial gainful work activity from November 28, 2020, through September 30, 2021. The ALJ found that Plaintiff had severe impairments of disorder of the cervical spine with radiculopathy, pinched nerve, osteoarthritis, traumatic brain injury ("TBI"), migraines, and obesity. (Tr. 35). The ALJ also found that Plaintiff had the non-severe impairments of small airway disease, seizures, osteoarthritis in bilateral knees, tendinitis in the wrists, and depression. (Tr. 36)

The ALJ determined Plaintiff's RFC as follows:

light work as defined in 20 C.F.R. § 404.1567(b) except that she could never climb ladders, ropes, or scaffolds; she could occasionally climb ramps and stairs; she could occasionally stoop, crouch, kneel and crawl; she could handle objects (i.e., gross manipulation) frequently with the bilateral upper extremities; she could finger (i.e., fine manipulation of items no smaller than the size of paper clip) frequently with the bilateral upper extremities; she could feel frequently with the bilateral upper extremities; she could frequently push and pull with the bilateral extremities up to the exertional limits of light work; she could reach frequently up to the height of the bilateral shoulders, but above the height of the bilateral shoulders she can only reach occasionally

overhead with the bilateral upper extremities; due to migraines, she needed to avoid noise above a moderate level as defined by appendix D of the Selected Characteristics of Occupations; she only occasional exposure to bright flickering or flashing lights and irritants such as fumes, odors, dust, and gases; she could have no exposure to unshielded moving mechanical parts or unprotected heights; she only occasional exposure to heat, cold, humidity and extreme vibrations; and she could not drive motor vehicles as part of the work function.

(Tr. 39). The ALJ also determined: "[s]pecifically, the combined effects of the claimant's impairments limited her to a range of light work, with reduced postural demands and accommodations in reaching, manipulating, pushing, and pulling with the upper extremities in consideration of the issues arising from her cervical degeneration. Her obesity and migraines limited her to occasional exposure to bright lights and atmospheric conditions, and no exposure to hazards." (Tr. 42).

Based on the testimony of Plaintiff and a vocational expert ("VE"), the ALJ found that Plaintiff could do her past relevant work as a medical assistant as generally performed per the Dictionary of Occupational Titles ("DOT"). (Tr. 42). Further, based on the testimony of the VE, the ALJ concluded that Plaintiff could also perform the following jobs: furniture rental clerk, office helper, and mail clerk. (Tr. 43).

### THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum & Order. The following summary of the record is directed only to the point raised by Plaintiff.

1.      **Background Information**

Plaintiff was born in 1992 and was 29 years old during the relevant period. (Tr. 42). She was 30, almost 31, on the date of the ALJ's decision. Plaintiff indicated she was disabled because of several problems including a permanent injury to the head, chronic migraines, depression, osteoarthritis in the neck, traumatic brain injury, and cervical radiculopathy. She was 5 feet and 7 inches tall and weighed 207 pounds. Plaintiff stopped working on July 10, 2020, because of her condition. (Tr. 247).

2.      **Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing in December 2022. (Tr. 33, 48). Plaintiff and the VE, Deborah Determan, testified at the hearing.

Plaintiff testified that she lives in a house with her mom and her three children, ages 8, 4, and 2. (Tr. 58). She can drive. Her last job was at Dollar Tree. She stopped working there in 2020 after her neurologist put her on medical leave due to pain in her left arm. (Tr. 59). She has a diploma as a medical assistant. (Tr. 60).

Plaintiff noted that she gets four to five migraines a week, which last from 30 seconds to two to three hours. (Tr. 60). Plaintiff takes topiramate and butalbital/acetaminophen/caffeine for the migraines. These medications ease the pain, but the topiramate makes her drowsy. She has not tried injectables because she had an allergic reaction to a previous Cortisone injection. (Tr. 61). Her migraines are triggered by loud noises and bright lights. (Tr. 63).

Plaintiff has osteoarthritis in the neck. She has problems looking up, down, left, and right, and her neck sometimes gets stiff. She takes cyclobenzaprine for the muscle spasms, once in the morning and once in the evening. (Tr. 62). If she stands too long, her neck gets heavy. Her neurologist does not want to perform surgery because she is too young. (Tr. 60).

Plaintiff has a pinched nerve in her left shoulder which makes it hard to lift things overhead, to grab items out of shelves, and to do anything that requires her arms to be above her shoulders. (Tr. 63).

Plaintiff can take care of her children by cooking, cleaning, and feeding them. (Tr. 62). She is also able to go to the store, however, she needs help to lift heavier items. (Tr. 63). Plaintiff has no issues sitting, bending, writing, or picking up little things. However, if Plaintiff stands for 45 minutes or longer, she experiences lower back pain. She can walk 30 to 40 minutes and carry about 10-15 pounds. She does drop items, and if she extends her arms above her head or straight out, her left arm gets heavy and falls. (Tr. 63-66).

Lastly, the VE testified. (Tr. 66-68, 69-74). The ALJ presented hypotheticals to the VE which corresponded to the ultimate RFC findings. The VE found that a person like Plaintiff could do the job as medical assistant as generally performed. (Tr. 71). The VE also found that there were jobs that existed in the national economy that a person like Plaintiff could do such as unskilled furniture rental clerk, office helper, mail clerk, as well as other jobs. (Tr. 72-73). The VE also testified that a person who would require an

additional 15-minute break a day and have two or more absences per month would not be able to maintain employment. The VE stated that her testimony is consistent with the information provided in the DOT. (Tr. 74).

### 3.    Relevant Medical Evidence[4]

On December 12, 2017, Plaintiff was kicked in the back of the head three times by someone in a group home. She went to the emergency room and was treated for a concussion. (Tr. 400-430).

On January 21, 2019, Plaintiff began treatment with neurology at St. Louis University Hospital for the December 2017 injury, which turned out to be a Traumatic Brain Injury ("TBI"). She presented with complaints of headaches with nausea/vomiting, sensitivity to light and to sound, and headaches five days a week. Doctor Aninda B. Acharya, neurologist, continued Plaintiff on Topamax, prescribed Nortriptyline, and ordered a brain MRI. (Tr. 432-453).

On February 7, 2019, Plaintiff had a Brain MRI, and the results were normal. (Tr. 419-420).

On April 29, 2029, Plaintiff treated with Dr. Acharya for a follow-up for "migraine without aura and without status migrainosus, not intractable-primary." (Tr. 455).

---

[4]    Plaintiff submitted additional records to the Appeals Council in connection with her request for review. Those records were not before the ALJ as some of them post-dated the ALJ's decision and some of them post-date the date last insured. *See* (Tr. 7-24). The Court cannot consider those records in reviewing for substantial evidence. *See Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 366, n.2 (7th Cir. 2004).

Plaintiff noted that she had headaches 1-2 times a week. Dr. Acharya decreased the Topamax due to fatigue and sedation, discontinued the Nortriptyline, and told Plaintiff to follow-up in three months. (Tr. 454-469).

Two months later, on June 25, 2019, Plaintiff saw Loveleena Alex, NP-C at W. Belleville Healthcare, for a medication refill, a follow-up, and a physical. (Tr. 866). Plaintiff's past problems of odyspnea, restless legs, periodic limb movement disorder, seasonal allergy, sleep apnea, snoring, and moderate major depression were reviewed. (Tr. 868). Plaintiff was diagnosed with tenosynovitis of the thumb, migraines, anemia, and dyspnea. She was advised to "have her neurologist fill[] out the medical statement from St. Clair County as she [wa]s still under their care for her migraines." (Tr. 870-871).

On June 26, 2019, Plaintiff saw Dr. Acharya again for continued migraines and tingling and numbness in her left thumb. Plaintiff reported that the Topamax was helping the severity and frequency of the headaches, but she still had them three times a week and the headaches could last for days. Dr. Acharya ordered an EMG/NCS for left radial radiculopathy and prescribed Gabapentin. (Tr. 470-473).

On June 27, 2019, Plaintiff followed up with Cheryl Pritchard-Palmer FNP-BC, PMHNP-BC at W. Belleville Health Care. She reviewed Plaintiff's past problems of dyspnea, restless legs, periodic limb movement disorder, seasonal allergy, sleep apnea, snoring, and moderate major depression. (Tr. 860-861). She assessed her with migraines and increased stress. She also told Plaintiff to go to the ER if symptoms got worse. (Tr.

864).

On June 27, 2019, Plaintiff went to the emergency room at Memorial Hospital in Belleville, Illinois, for complaints of numbness and tingling in her left hand, headaches, left side neck pain radiating down the left upper arm, and pain in the left wrist. (Tr. 1326). The next day, on June 28, 2019, Plaintiff went to St. Elizabeth's Outpatient Therapy for an occupational therapy visit for left thumb tenosynovitis and suspected cervical radiculopathy with additional intersection syndrome prestation. She had limited range of motion at the shoulder, elbow, wrist, and thumb. She also had decreased grip and pinch strength on the left hand. (Tr. 1320-1325).

On July 16, 2019, Plaintiff treated with Dr. Miguel Granger of State Street Health Care for an ER follow-up and complaints of left arm pain. Dr. Granger reviewed Plaintiff's problems of dyspnea, restless legs, periodic limb movement disorder, seasonal allergy, sleep apnea, snoring, and moderate major depression. (Tr. 855-857). He diagnosed her with neuropathy and injury of the head. (Tr. 859).

On August 2, 2019, Plaintiff visited Dr. Acharya for a follow-up. Plaintiff reported continued pain and tingling in the left upper extremity, hyperesthesia around her left thumb, and pain in the left neck region. Plaintiff reported that occupational therapy helped her symptoms. The EMG/NCS tests were negative. Dr. Acharya increased the Topamax and ordered an MRI of the cervical spine. (Tr. 484-497).

The cervical spine MRI in September 2019 revealed no evidence of cord

abnormality or neural impingement, but it revealed mild facet osteoarthritis on the left side at C2-C3 and C3-C4. (Tr. 415-418).

Thereafter, Plaintiff saw Dr. Lebeau at the W. Belleville Health Care Center for a follow-up visit on September 3, 2019. Dr. Lebeau reviewed her problems of cervical radiculopathy (onset date 9/13/2019), dyspnea, restless legs, periodic limb movement disorder, seasonal allergy, snoring, and moderate major depression. (Tr. 849-851). He diagnosed her with periodic limb movement and radiculopathy, cervical region. He told Plaintiff to "[k]eep your appointment for the mri and follow[-]up with neurology." (Tr. 853).

On January 1, 2020, Plaintiff again saw Dr. David Lebeau for complaints of left wrist pain. Dr. Lebeau reviewed her problems of obesity (onset date 11/13/2020), cervical radiculopathy (onset date 9/13/2019), dyspnea, restless legs, periodic limb movement disorder, seasonal allergy, snoring, and moderate major depression. (Tr. 843-845). He diagnosed her with tendinitis of the wrist and prescribed a splint. (Tr. 847-848).

In July, August, September, and October 2020, Plaintiff had physical and occupational therapy for cervical radiculopathy and neck pain on the left side. She had limited range of motion and strength and a positive left nerve compression test. (Tr. 339-371). In the last physical therapy note on October 5, 2020, the therapist noted Plaintiff reporting the following: "continued improvement, no pain for the past week; Reports improved use of L hand for grasping objects and improved sleeping; Reports still has

some HA's and occasional pain in her neck but basically feeling fine overall; Reports performing Hep w/o c/o; Pt reports she feels able to continue HEP on her own and discontinue PT at this time; Patient voices pain level of 0/10 at bilat neck / UT." (Tr. 339-340).

On August 26, 2020, Dr. Acharya saw Plaintiff via telehealth. She noted that Plaintiff had improved with therapy. Dr. Acharya also noted that Plaintiff should continue with medical leave due to her condition and that she would see Plaintiff in 6 to 8 weeks to determine her ability to return to work. (Tr. 538).

On November 25, 2020, Plaintiff saw Dr. Acharya via telemedicine. Plaintiff informed the doctor that she had been doing well with physical and occupational therapy and that she has migraines several times a month. Dr. Acharya continued Plaintiff on Topamax, Gabapentin, and Flexeril; Fioricet was also prescribed. (Tr. 336-338).

On December 7, 2020, Plaintiff treated with Dr. David Lebeau for complaints of left side pain. Dr. Lebeau reviewed her problems of obesity (onset date 11/13/2020), cervical radiculopathy (onset date 9/13/2019), dyspnea, restless legs, periodic limb movement disorder, seasonal allergy, snoring, and moderate major depression. (Tr. 837-839). In the discussion notes, Dr. Lebeau stated: "[y]ou should follow[-]up with your neurologist if you need additional treatment such as steroid injections or additional time off work. My recommendation would be to return to work and treat the pain with meloxicam." (Tr. 842).

On February 17, 2021, Plaintiff had a virtual appointment with Dr. Acharya. During this visit, Plaintiff reported that she stopped physical and occupational therapy, that her headaches had improved, and that she recently developed pain in her left hand near the thumb as well as periodic weakness of the left arm. (Tr. 330-331).

In March 2021, Plaintiff had an EMG/NCS. The results of the EMG/NCS showed a left-sided C7 radiculopathy. (Tr. 328-330).

On April 2, 2021, Plaintiff had a follow-up with Dr. Acharya. Dr. Acharya noted that Plaintiff takes Gabapentin, Topamax, Fioricet, and Flexeril as needed; that Plaintiff's headaches have improved but still occur approximately 10 times per month; and that she continues to have pain and tingling in the left upper extremity. (Tr. 326). Dr. Acharya increased the Gabapentin and ordered physical therapy and an MRI of the left brachial plexus. (Tr. 328).

In May 2021, Plaintiff had another cervical spine MRI which showed normal examination of the left brachial plexus and reactive adenitis of the bilateral jugulodigastric chain, the supraclavicular regions, and the bilateral axial regions without affecting the brachial plexus. (Tr. 409-411). On June 11, 2021, Plaintiff had a brain MRI, and the results were normal. (Tr. 407).

On September 21, 2021, Plaintiff had another follow-up with Dr. Acharya. Plaintiff reported improved symptoms, but she had continued neck and shoulder pain on the left side. Plaintiff also reported an episode from July where she became confused and blacked

out. (Tr. 625). Dr. Acharya instructed her not to drive and ordered an EEG given that Plaintiff may have suffered a seizure. (Tr. 629).

In September 2021, Plaintiff went to a cardiology clinic for the black out episode, and she reported occasional chest tightness and pressure. (Tr. 645). A 30-day event monitor was ordered for Plaintiff. (Tr. 647-648). In October 2021, the event monitor showed no sustained arrhythmias. (Tr. 690). The November EEG was normal. (Tr. 691).

### 4.    State Agency Consultants' Opinions

On November 18, 2021, Dr. Stephen Drake, Ph.D., opined that there was insufficient evidence to substantiate the presence of depressive, bipolar, and related disorders. (Tr. 119). On November 23, 2021, Dr. Craig Billinghurst, MD, found that Plaintiff could perform light work with frequent left handling, fingering, and feeling on the left side. Specifically, he found Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour day; sit about 6 hours in an 8-hour day; unlimited in push and/or pull, other than shown for lift and/or carry. He further found that Plaintiff could reach unlimited in any direction, but that she had limited but frequent handling, fingering, and feeling of the left hand. (Tr. 120-122).

On January 19, 2022, Dr. Richard J. Hamersma, Ph.D., concluded that there was insufficient evidence to substantiate the presence of depressive, bipolar, and related disorders. (Tr. 133-134). On January 21, 2022, Dr. James L. Greco, MD, determined that

Plaintiff could perform light work with frequent handling, fingering, and feeling on the left side. In particular, he determined that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk 6 hours in an 8-hour day; sit 6 hours in an 8-hour day; unlimited in push and/or pull, other than shown for lift and/or carry. He further determined that she could frequently climb ramps/stairs; never climb ladders, ropes, or scaffolds; and that she could frequently balance, stoop, kneel, crouch, and crawl. He also determined that Plaintiff could reach unlimited in any direction; had unlimited feeling of the left hand, but that she had limited but frequent handling and fingering of the left hand. Lastly, he determined that she should avoid concentrated exposure to vibration and hazards. (Tr. 136-139).

### 5.    Imaging Reports

As previously noted, Plaintiff had a brain MRI on February 7, 2019, and the results were normal. (Tr. 419-420). Seven months later in September 2019, Plaintiff had a cervical spine MRI, and the results revealed no evidence of cord abnormality or neural impingement but did show mild facet osteoarthritis on the left side at C2-C3 and C3-C4. (Tr. 415-418). In May 2021, Plaintiff had another cervical spine MRI which showed normal examination of the left brachial plexus and reactive adenitis of the bilateral jugulodigastric chain, the supraclavicular regions, and the bilateral axial regions without affecting the brachial plexus. (Tr. 409-411). On June 11, 2021, Plaintiff had another brain MRI, and the results were normal. (Tr. 407).

DISCUSSION

Plaintiff argues that the RFC was improperly based on the ALJ's own lay interpretation of the raw medical data than upon substantial evidence. The Court rejects this argument. The ALJ "must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between [] opinions . . . ." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). The determination of the RFC is an administrative finding that is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(2).

Plaintiff argues that the ALJ erred by "playing doctor." *See generally Goins v. Colvin*, 764 F.3d 677 (7th Cir. 2014); *Israel v. Colvin*, 840 F.3d 432 (7th Cir. 2016); *Moon v. Colvin*, 763 F.3d 718 (7th Cir. 2014). In *Goins*, the error was that the ALJ interpreted for herself the results of an MRI, ignored the MRI finding of Chiari I malformation, and made no effort to compare that MRI with an earlier one. *See Goins*, 764 F.3d at 680. In *Israel*, the error involved the ALJ's faulty interpretation of the MRI results. *See Israel*, 840 F.3d at 439-440. And in *Moon*, the ALJ mistakenly read the MRI results. *See Moon*, 763 F.3d at 722. These cases are not analogous to the case at bar. Dr. Greco reviewed the most recent MRI. The ALJ considered his opinion but found that Plaintiff should have more restrictions in returning to work.

In fact, the ALJ did not adopt the state agency consultants' assessments. The state agency consultants assessed plaintiff as being capable of light work with additional

limitations. While the ALJ found these assessments persuasive overall, the ALJ found that Plaintiff could perform light work with further needed limitations. In fact, the ALJ's assessment was more restrictive than either of the assessments based on Plaintiff's own testimony. In particular, the ALJ noted:

> Drs. Billinghurst and Greco supported their opinions with the evidence available to them, including that the claimant experienced improvement in migraines with medication, that electromyography documented left C7 radiculopathy, and that physical examinations document intact head turning and shoulder shrug, full strength, and mildly decreased sensation in the left fourth and fifth digits. These findings remain largely consistent with the hearing-level record, which continues to demonstrate good control of the claimant's symptoms with treatment and intact physical findings during the relevant period. (Exhibit B5F/99-101, 110, 131), and they are therefore found persuasive overall. However, in light of the claimant's testimony, insofar as it is not inconsistent with the treatment record, the undersigned finds some additional limitations are warranted, particularly on reaching and bilateral manipulation given the claimant's cervical degeneration and radiculopathy, and exposure to environmental irritants due to her migraines and obesity.

(Tr. 41). Thus, the ALJ reasonably included more restrictions. *See, e.g.*, *Palmer v. Saul*, No. 19-1079, 779 Fed. Appx. 394, 398 (7th Cir. Aug. 23, 2019) (stating that "the ALJ's RFC findings were more restrictive than the conclusion of those non-examining physicians, and [plaintiff] does not explain how a more restrictive RFC could have negatively affected her claim."); *Dudley v. Berryhill*, No. 18-1629, 773 Fed. Appx. 838, 842 (7th Cir. May 16, 2019) (finding no error where the ALJ's RFC assessment was "*more* restrictive than the functional work-related limitations identified by the state agency doctors.") (emphasis in original).

Finally, the ALJ concluded:

the above residual functional capacity is consistent with the medical evidence, opinion evidence, and other evidence as discussed above in more detail. Specifically, the combined effects of the claimant's impairments limited her range of light work, with reduced postural demands and accommodations in reaching, manipulating, pushing, and pulling with the upper extremities in consideration of the issues arising from her cervical degeneration. Her obesity and migraines limit her to occasional exposure to bright lights and atmospheric conditions, and no exposures to hazards.

(Tr. 41). In issuing the decision, the ALJ cited to medical evidence which showed Plaintiff's positive response to medication and physical therapy. The ALJ also considered Plaintiff's testimony regarding her daily activities. Thus, the ALJ thoroughly considered the evidence contained in the record in rendering his decision.

Plaintiff's arguments are little more than an invitation for the Court to reweigh the evidence. She has not identified any error requiring remand. Even if reasonable minds could differ as to whether Plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *See Burmester,* 920 F.3d at 510; *Shideler v. Astrue,* 688 F.3d 306, 310 (7th Cir. 2012).

CONCLUSION

After careful review of the record, the Court concludes that the ALJ committed no errors of law and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of Defendant and against

Plaintiff.

**IT IS SO ORDERED.**

**DATED: June 26, 2024.**

Gilbert C Sison

Digitally signed
by Gilbert C Sison
Date: 2024.06.26
10:36:32 -05'00'

_____

**GILBERT C. SISON**
**United States Magistrate Judge**